**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

_____

**WILLIAM MILLER,**

     Plaintiff,

     v.                                               Civ. No. 05-577 BB/LAM

**PAUL SPIERS, MICHAEL FOX, and DONNA
ARBOGAST,**

     Defendants.

**MEMORANDUM OPINION AND ORDER**

This matter is before the Court for consideration of motions for summary judgment filed by Defendants (Docs. 211, 214).  The motions seek dismissal of the one claim left in the case following the Tenth Circuit's reversal and remand of earlier judgments entered by this Court. Having reviewed the submissions of the parties and the relevant law, the Court finds that the motions for summary judgment should be granted.

**Summary of Relevant Facts and Procedural History**

This case arises out of the murder of Girly Hossencofft, and the ensuing investigation of that murder.  The facts of this case have been set out in several opinions written by this Court, and in the Tenth Circuit's opinion, and will not be repeated here.  *See Miller v. Spiers*, 339 Fed.Appx. 862 (10th Cir. 2009).  Furthermore, at this point the only relevant procedural history consists of the instructions given to this Court by the Tenth Circuit; on remand from that tribunal this Court's inquiry is limited to following the mandate established by the Tenth Circuit in its opinion.  *See Procter & Gamble Co. v. Haugen*, 317 F.3d 1121, 1126 (10th Cir. 2003) (district court is bound to follow the mandate, and the mandate controls all matters within its scope, although the district court remains free to pass upon any issue which was not expressly or impliedly disposed of on appeal).  As the parties are aware, the Tenth Circuit's opinion does the

following:  (1) it establishes that Plaintiff's claim is a singular claim for constitutional malicious

prosecution, based on an alleged conspiracy between the three Defendants; (2) it requires this

Court, in the first instance, to determine the particular confines of that claim; and (3) it requires

this Court to determine whether either the favorable-termination requirement or the *Heck v.*

*Humphrey* analysis precludes Plaintiff from bringing his malicious-prosecution claim.  The Court

will carry out these tasks in this opinion, keeping in mind the summary-judgment framework

under which it is operating.  In addition, the motions filed by Defendants address the merits of

Plaintiff's claim, and the Court will decide those merits to the extent appropriate in order to

resolve the motions for summary judgment.

**Standard of Review**

Summary judgment is appropriate 'if the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to a judgment as a

matter of law.'" *Medina v. Income Support Div.*,  413 F.3d 1131, 1133 (10th Cir. 2005) (quoting

Fed. R. Civ. P. 56(c)).  In response, the nonmoving party must come forward with "specific facts

showing that there is a genuine issue for trial."  *Matsushita Elec. Indus. Co. v. Zenith*, 475 U.S.

574, 587-88 (1986).  To avoid summary judgment, the nonmoving party may not rest upon the

mere allegations in the pleadings but must show, at a minimum, an inference of the existence of

each essential element of the case.  *Eck v. Parke, Davis & Co.*, 256 F.3d 1013, 1016-17 (10th Cir.

2001) (citing *Hulsey v. K-Mart, Inc.*, 43 F.3d 555, 557 (10th Cir. 1994)). When viewing the

evidence, the Court must draw reasonable inferences in favor of the non-moving party.

*Matsushita*, 475 U.S. at 587.

**DISCUSSION**

**I. Issues Raised By Tenth Circuit**

**A. Confines of Plaintiff's Claim:**  Plaintiff was first indicted in 2001, and was charged with conspiracy to commit first-degree murder, kidnapping, conspiracy to commit kidnapping, and several counts of tampering with evidence.  [Doc. 214, Exh. 3]  Subsequently the matter was presented to another grand jury, in 2002, which declined to find probable cause for any of the murder or kidnapping offenses, but indicted Plaintiff for five counts of tampering with evidence. [Doc. 216, Exh. 30]  The allegations supporting these five counts were as follows: (a) Plaintiff burned a business card bearing the name of Linda Henning; (b) Plaintiff discarded a notebook during his February 12, 2001 arrest; (c) after that arrest, but on the same date, Plaintiff hid papers in his sock; (d) also after that arrest and on the same date, Plaintiff ate several different business cards or papers.  In July 2003, Plaintiff entered into a plea agreement by the terms of which the first two charges in the indictment were dismissed, and Plaintiff pled guilty to three charges of attempted tampering with evidence, based on the allegations of hiding papers in his sock and eating other papers.  [Doc. 214-14]

In open court and in his briefs, counsel for Plaintiff has made it clear that his malicious-prosecution claim is not based solely on the murder-and-kidnapping-related charges, as the Tenth Circuit assumed might be the case, but also on the two tampering-with-evidence charges that were dismissed pursuant to his plea bargain.  Plaintiff carefully excludes the tampering charges to which he pled guilty, apparently in an effort to avoid any difficulty that might arise due to the favorable-termination requirement that will be discussed below.[1]  Therefore, the  Court finds the

---

[1]Plaintiff's attempt to distinguish the discarding-the-notebook charge from the three charges of which he was convicted is less than persuasive.  He points out that the latter three charges arose out of actions he took after he was arrested.  However, the Court sees little practical or legal difference between actions taken after an arrest and those, such as the alleged disposal of the notebook, that occur during or just prior to an arrest.  In any event, as discussed

confines of Plaintiff's malicious-prosecution claim include the conspiracy-to-commit-first-degree-murder charge, the kidnapping charge, and the conspiracy-to-commit-kidnapping charge contained in the initial indictment, as well as the two tampering-with-evidence charges brought in the second indictment but dismissed pursuant to Defendant's plea bargain.

   **B.  Favorable Termination:**  The Tenth Circuit's opinion pointed out that a primary issue in this case is whether Plaintiff has satisfied the favorable-termination element of his malicious-prosecution claim.  *See, e.g., Wilkins v. DeReyes*, 528 F.3d 790, 799 (10th Cir. 2008) (setting out elements of such a claim, including the requirement that there must have been a favorable termination of the underlying charge or charges).  Defendants argue that none of the charges that constitute Plaintiff's claim satisfy this requirement.  They first point out that the conspiracy and kidnapping charges contained in the 2001 indictment were dismissed only because those same charges, as well as others, were presented to the 2002 grand jury.  As to the two tampering charges dismissed in 2003, Defendants note they were dismissed as part of a plea bargain.  According to Defendants, neither of these dismissals can be considered a favorable termination of the charges for purposes of a malicious-prosecution claim.[2]

_____

below, Plaintiff's effort to skirt the favorable-termination requirement is unsuccessful with respect to the two tampering charges dismissed as part of his plea bargain.

   [2]For some reason unbeknownst to the Court, counsel for Plaintiff did not bother to address the arguments made by Defendants concerning the favorable-termination requirement. He mentions the phrase "favorable termination" only in a heading in one of his briefs, entitled "Because there was no probable cause against Miller, he had a favorable termination".  The discussion under that heading concerns only probable cause, and does not discuss favorable termination.  This is a remarkable omission, given the Tenth Circuit's statement highlighting the favorable-termination requirement as a major issue in this case, and the fact that  Defendants' briefs discuss the issue in plain terms.  Despite counsel's inexplicable failure to address the issue, the Court is mindful of its responsibility to follow the guidelines set out in the Tenth Circuit's opinion and, in addition, to grant summary judgment only where the parties seeking such judgment have established a legal and factual right to it.  *See Reed v. Bennett*, 312 F.3d 1190, 1195 (10th Cir. 2002) ("[A] party's failure to file a response to a summary judgment motion is not, by itself, a sufficient basis on which to enter judgment against the party. The district court

In support of their argument concerning the conspiracy and kidnapping charges, Defendants rely on Section 660 of the Restatement (Second) of Torts (1977). Defendants contend that a *nolle prosequi* was filed concerning the 2001 charges only because new proceedings had been instituted for the same offenses, which according to Defendants means the dismissal cannot be considered a favorable termination. It is true that the Restatement indicates the favorable-termination requirement will not be met if "new proceedings for the same offense have been properly instituted..." *Id.* § 660(d). However, that same sentence adds a proviso: "and [the new proceedings] have not been terminated in favor of the accused." *Id.* In other words, if new proceedings have been instituted but those new proceedings end in a way that constitutes a favorable termination of the charges, this element of the malicious-prosecution claim will have been satisfied. In this case, new proceedings were indeed instituted, in the form of the 2002 grand jury proceedings; however, that grand jury declined to indict Plaintiff on the conspiracy and kidnapping charges. This leads to the critical question – whether a grand jury's refusal to indict a defendant on certain charges should be considered a favorable termination of those charges.

The common-sense answer to the above question is yes; where a grand jury does not find probable cause to return an indictment, it seems obvious that such a result is favorable to the defendant. Moreover, the law supports this common-sense resolution of the issue. A plaintiff satisfies the favorable-termination requirement by demonstrating that the prior criminal proceeding was terminated by the grand jury's refusal to indict. *See Kossler v. Crisanti*, 564 F.3d 181, 187 (3d Cir. 2009); Restatement (Second) of Torts, § 659(b) (1977). In this case, therefore, the dismissal of the conspiracy and kidnapping charges due to the impending indictment from the

---

must make the additional determination that judgment for the moving party is 'appropriate' under Rule 56."). The Court therefore reluctantly engages in the analysis of favorable termination that should have been the job of Plaintiff's counsel.

2002 grand jury was not in itself a favorable termination of those charges; however, when the 2002 grand jury declined to indict Plaintiff on the charges, a favorable termination of the charges did occur.

Defendants fare better with their second argument, directed at the two tampering-with-evidence charges dismissed in 2003.  The undisputed evidence establishes that these two charges were dismissed as part of Plaintiff's plea-bargain pursuant to which he entered no-contest pleas to three counts of attempted tampering with evidence.  [Doc. 212, Exh. 16]  In fact, the plea agreement specifically states that "[i]n consideration of the Defendant's plea of No Contest to the counts listed above, counts one (1) and two (2) [of the 2002 indictment] shall be dismissed with prejudice."  [*Id.*, p. 2]  According to the Restatement and all applicable case law, charges are not considered to be favorably terminated when they are dismissed "pursuant to an agreement of compromise with the accused..."  Restatement (Second) of Torts § 660(a).  Such an "agreement of compromise" certainly includes a plea bargain such as the one entered into here by Plaintiff. *See Parker v. Town of Swansea*, 270 F.Supp.2d 92, 104 (D. Mass. 2003) (dismissal of charges was not favorable termination where it occurred only after defendant pled guilty to other charges); *White v. Wortz*, 66 F.Supp.2d 331, 334 (D. Conn. 1999) (same); *cf. Hilfirty v. Shipman*, 91 F.3d 573, 580 (3d Cir. 1996) (dismissal of charges pursuant to defendant's agreement to enter into alternative charge-resolution program was not favorable termination).  The two counts of tampering that were dismissed in 2003 – one involving the Linda Henning business card, and one the notebook seized during Plaintiff's arrest at a supermarket – were explicitly dismissed in exchange for Plaintiff's no-contest plea to three other charges.  Therefore, the dismissal does not constitute a favorable termination of those charges, and Plaintiff may not base any part of his malicious-prosecution claim on those charges, despite his efforts to retain them in the case.

**C.  Effect of Plaintiff's Attempted Tampering With Evidence:**  The Tenth Circuit instructed this Court to inquire into what effect, if any, Plaintiff's efforts to tamper with evidence might have had on the dismissal of the conspiracy and kidnapping charges.  *Miller v. Spiers, supra*, 339 Fed.Appx. at 868-69.  This instruction was required because a defendant is not allowed to benefit from his own illegal actions; if a defendant tampers with evidence, and thereby destroys evidence that was crucial to proving a different charge, the dismissal of that other charge for lack of evidence will not be considered a favorable termination.  *See Wilkins v. DeReyes*, *supra*, 528 F.3d at 803-04.  Defendants have not argued that Plaintiff's actions in any way caused the 2002 grand jury's refusal to indict Plaintiff for the conspiracy and kidnapping charges.  The Court's review of the evidence, furthermore, indicates there was no such effect.  Plaintiff did not actually destroy any of the evidence; it was all either retrieved in one piece or was pieced together by the government, and was therefore available for use in prosecuting Plaintiff.  Also, all of the evidence had either no relevance to the conspiracy and kidnapping charges, or was of marginal relevance at best.  The Court therefore determines the favorable-termination element of Plaintiff's claim is not undermined by any of the actions that resulted in his convictions for attempted tampering with evidence.

**D.  Heck v. Humphrey:**  The Tenth Circuit also suggested that the Supreme Court's decision in *Heck v. Humphrey*, 512 U.S. 477 (1994), might apply to bar Plaintiff's claims.  Following up on that suggestion, Defendants have understandably raised the *Heck v. Humphrey* argument in their briefs.  Counsel for Plaintiffs, true to form, did not even mention this issue in either of his response memoranda.[3]  Once again, however, the Court is required to address the

---

[3]It is possible counsel failed to discuss the issue because his response briefs appear to attempt to preserve all prior arguments he has ever made in any previous brief he has filed, and some of those briefs do discuss the *Heck* opinion.  This reference to other briefs is not a proper briefing tactic and the Court is not required to peruse every brief filed by counsel to determine whether any *Heck* arguments are made therein, and if so how they might be relevant to this case

question despite counsel's lack of diligence.  Since the Tenth Circuit decided the appeal in this

case and remanded the matter to this Court, the Tenth Circuit has addressed a *Heck v. Humphrey*

issue that had been an open question in this Circuit.  *See Cohen v. Longshore*, 621 F.3d 1311,

1316-17 (10th Cir. 2010).  The *Cohen* opinion holds that the *Heck v. Humphrey* bar does not

apply to an individual, such as Plaintiff, who has completely served the sentence underlying his

prior conviction.  The Tenth Circuit reasoned that such an individual does not have access to the

remedy of habeas corpus, and found (in accordance with approximately half of the other circuits)

that without such access the basis for the *Heck v. Humphrey* bar does not exist.  *Id.*  Plaintiff

received only a suspended sentence in 2003 when he pled no contest to the three attempted

tampering charges, and has long since completed the 364-day period covered by the suspended

sentence.  Under *Cohen*, therefore, *Heck v. Humphrey* has no applicability to this case.[4]

## II.  Merits

Each Defendant has moved for summary judgment on the merits, with Defendant Spiers

arguing he is entitled to absolute and qualified immunity, while Defendants Arbogast and Fox

mount a direct attack on the merits of the malicious-prosecution claim.  In response, before

---

following the Tenth Circuit's remand.

[4]If Plaintiff had not already completed service of his suspended sentence, the Court would still reject the application of *Heck v. Humphrey* to this case.  Although Defendants contend the three attempted-tampering convictions cannot be separated from the conspiracy and kidnapping charges, the Tenth Circuit has held otherwise, by holding that charges contained in an indictment may indeed be the basis of a malicious-prosecution claim even though a defendant is found guilty of other charges contained in that same indictment.  *Miller v. Spiers*, 339 Fed.Appx. at 867-68. There is a clear line of separation between the conspiracy and kidnapping charges, upon which the grand jury refused to return an indictment, and the tampering charges, which were not disposed of until the 2003 plea.  Furthermore, the tampering charges to which Plaintiff entered pleas did not arise until Plaintiff's arrest, and he has made no allegation that the charges were based on fabricated evidence, which is the essential component of his malicious-prosecution claim.  Should Plaintiff succeed on his malicious-prosecution claim, therefore, it would in no way impugn his convictions for attempted tampering with evidence.  Therefore, the *Heck* bar does not apply to this case.

discussing the legal arguments raised by each Defendant, Plaintiff discusses a number of issues concerning the quality of the evidence relied on by Defendants in the underlying case and levels broad accusations of misconduct against Defendants. The Court will first address several of these issues that either concern all Defendants or, due to the Court's resolution of the issue, will have no impact on the Court's consideration of the case. The Court then analyzes the evidence and arguments presented with respect to each Defendant individually.[5]

**A. Issues Common to All Defendants**

**1. Plaintiff's Alibi:** Plaintiff points out that he had an alibi for the afternoon and evening of September 9, 1999, and another one for September 10, 1999, and faults Defendants for refusing to accept the alibis as conclusive proof of his innocence. The flaws in this argument, however, are apparent. Defendants had no way of knowing exactly when Girly Hossencofft was abducted or killed, and Plaintiff's alibi covered only a portion of the time during which she might have disappeared. For example, Plaintiff could have left his home after eating pizza with his

---

[5]As the Court alluded to above, counsel for Plaintiff has engaged in an improper briefing tactic with respect to Defendants' motions. Counsel states, in each of his response briefs, that "[t]his brief does not replace the arguments and contested facts established in previous response briefs." Counsel appears to assume it is this Court's responsibility to comb through past pleadings, divine the arguments counsel made in those pleadings, and address them in this opinion to decide whether Defendants are entitled to summary judgment. This is simply not the case. It was incumbent on counsel for Plaintiff to point out in his current briefs all contested issues of fact and all legal arguments that might affect the outcome of this case. *See United States v. Real Property Identified as: Parcel 03179-005R*, 287 F.Supp.2d 45, 61-62 (D. D.C. 2003) (failure to adequately articulate defenses permits granting of summary judgment). While the Court has reviewed all of the exhibits submitted by Plaintiff at any time during these proceedings, the Court makes no pretense to have engaged in the job of Plaintiff's counsel and to have dredged up legal arguments he might have made in previous briefs. This opinion addresses the arguments counsel has made in the current briefs. Due to counsel's failure to properly point the Court toward all relevant evidence that is contained in the record, it is possible the Court may have missed certain legal or factual arguments or certain contested facts believed by Plaintiff to be highly material. If that has occurred, the fault lies with counsel for Plaintiff and not this Court.

family the evening of the 9th, or in the early morning hours of the 10th, and still been within the window of time that possibly included Girly's murder.  It would therefore have been unreasonable for Defendants to simply rely on the alibi and fail to further investigate Plaintiff's possible involvement in the crime.

2.  **Contamination of the Evidence:**  Plaintiff argues strenuously that the carpet in Girly's apartment was contaminated by the number of people who walked on it during the investigation, and by the manner in which it was handled.  He also argues that the tarp and clothing found near Magdalena, New Mexico, were "beyond contaminated" because they were located on the ground and in a location where wind and wild animals could easily deposit trace evidence on them.  Plaintiff seems to contend that, due to this presumed contamination, Defendants should have ignored or greatly discounted the trace evidence that was found on the carpet, the tarp, and the clothing.

The only support Plaintiff offers for his assertion is the bare argument of his counsel.  He has presented not one bit of expert evidence tending to establish that the alleged contamination did in fact occur, or was so severe that all trace evidence found on the carpet, the tarp, or the clothing should be discarded and given no weight whatsoever.  The occurrence or extent of contamination of evidence under the circumstances presented by this case is not something that can simply be presumed as a matter of common sense; an expert opinion would be required before this Court, or any fact-finder, could discount evidence in the manner urged by Plaintiff.  Argument of counsel simply cannot substitute for such an evidentiary showing.  *See Pinkerton v. Colorado Dep't of Transp.*, 563 F.3d 1052, 1061 (10th Cir. 2009) (argument of counsel is not evidence, and does not provide a proper basis to deny summary judgment).  Furthermore, as a legal matter the possible contamination of evidence does not affect the admissibility of that evidence, but only the weight to be accorded the evidence.  *See Harris v. Vild*, 1990 WL 1345

10

(9th Cir. 1990, unpublished); *United States v. Morrow*, 374 F.Supp.2d 42, 49-50 (D. D.C. 2005

(citing cases).  Plaintiff has failed to produce any evidence at all that would justify a total

rejection, due to contamination, of the trace evidence located on the carpet, the tarp, and the

clothing.  Even more so, he has produced no evidence that would allow a finding that laypersons

such as Defendant Fox and Defendant Spiers, and even an expert such as Defendant Arbogast,

should have known the evidence was so contaminated as to be virtually worthless.[6]  Plaintiff's

"contamination" argument, therefore, merits no weight in the determination of Defendants'

motions.[7]  In fact, it would have been irresponsible for Defendants to ignore the trace evidence

they were able to locate on these materials, despite the potential contamination described by

Plaintiff.

    **3.  Reliance on Forensic Analyses of Trace Evidence:**  Plaintiff attacks Defendants'

reliance on forensic evidence presented by Defendant Arbogast and another forensic scientist

involved in this case, Philip Aviles.  Plaintiff characterizes the analyses performed by these

individuals as "pseudo-science."  His attack centers in part on Arbogast's use of the term

"consistent" to describe similarities between trace evidence found on the tarp, for example, and

in certain areas of Plaintiff's home.  He points out that Arbogast gave two different definitions of

what she meant when she used the term "consistent" in her reports and testimony, and notes that

---

[6]The Court notes that despite the contamination, several pieces of unusual evidence were located on these items, evidence of a type that would not be expected to be tracked in by detectives, wild animals, or the wind.  This evidence consisted mainly of the dyed rabbit and deer hair, and dyed feathers, that were found on the tarp or Girly's carpet, as well as Plaintiff's residence.  [Doc. 214, Exh. 15; doc. 43, Exh. 8]

[7]Due to this resolution of the issue, the Court need not address the City Defendants' argument that the contamination issue should have been the subject of an amendment to the complaint, rather than being raised for the first time in Plaintiff's response brief.  Similarly, the Court need not address the argument that the alleged contamination established at most negligence on the part of Defendants, rather than the reckless or deliberate action that is required to establish a constitutional violation of the sort alleged by Plaintiff in this case.

a different forensic scientist, Philip Aviles, no longer uses that term and has not done so for many years.  Instead, rather than opining that two pieces of trace evidence are consistent with each other, Aviles states they are "basically similar to" each other, or display the same characteristics.  [Doc. 216, Exh. 21]  Aviles believes the term "consistent" requires too much explanation in a courtroom or deposition.  [*Id.*]  Finally, Plaintiff notes that Aviles could not assign a numerical percentage or a statistical level of certainty for his opinion that a feather found on the tarp could have originated from the same source as fishing-lure material located in Plaintiff's home.  [Doc. 216, Exh. 22]  On the basis of all of the above factors, Plaintiff contends the trace evidence relied on by Defendants in this case was without any worth whatsoever and should have been ignored by Defendants Fox and Spiers.  As discussed below, Plaintiff's argument is without merit.

The Court notes, first, that the claimed discrepancy between Defendant Arbogast's two definitions of the term "consistent" is in reality no discrepancy at all.  When testifying before a grand jury, Arbogast explained that an item she calls "consistent" with another item must have the same characteristics as the second item, and must have no substantial differences.  [Doc. 216, Exh. 17]  At some other point, in giving a sworn statement in front of several attorneys, she defined "consistent" to mean that an item "contains all the macroscopic and microscopic characteristics that the known standard or the known specimen contains, and that there are no differences."  [Doc. 216, Exh. 19]  The latter definition is simply a more detailed and more scientific version of the former, which makes sense given the two audiences she was addressing.

Next, the Court addresses the fact that Aviles prefers to use terminology other than "consistent" in his work.  Aviles did not testify that the term "consistent" should not be used by forensic scientists, or that Arbogast's definition of the term was erroneous in any way.  In fact, he essentially repeated her definition in short-hand form when he gave his understanding of the term, stating that it meant "similar to, the same as, displaying the same characteristics."  [Doc.

12

216, Exh. 21]  His only objection to the term was that it is too general, in his opinion, and

requires extra explanation when it is used in court or in other legal proceedings.  [*Id.*][8]  It is also

important to point out that courts all over the country rely on experts who provide opinions that

certain materials or evidence are "consistent" with other materials or evidence.  *See, e.g.,*

*Rhoades v. Henry*, 598 F.3d 495, 506 (9th Cir. 2010) (in characterizing the evidence against the

defendant as "quite strong" the court notes that hairs consistent with the defendant's were found

on the victim); *United States v. White*, 582 F.3d 787, 804 (7th Cir. 2009) (discussing trace-

evidence expert's testimony that particles "consistent with gunshot residue" were found on the

defendant's hands); *Farrell v. Soares*, 211 Fed.Appx. 766, 771 (10th Cir. 2007) (in discussing

"considerable physical evidence" linking the defendant to the crimes, Tenth Circuit points out

that pubic hairs consistent with one defendant were located in the shower).  Given the broad

acceptance of such testimony by courts, and Plaintiff's failure to present any expert testimony

tending to establish that use of the term "consistent" by a forensic scientist is not an acceptable

practice, the Court rejects Plaintiff's general attack on Defendant Arbogast's forensic opinions,

well as the reliance placed on those opinions by Defendants Fox and Spiers.[9]

     As to Plaintiff's final broadside against the forensic evidence, this argument is also

without merit.  Plaintiff contends the inability to place any statistical or numerical percentage on

the similarity between two pieces of trace evidence renders unreliable any opinion that might

state the materials are "consistent" or "could have come from the same source."  As noted above,

Mr. Aviles did state he could not place such a mathematical value on the extent of similarity

---

[8]The Court notes that the terms preferred by Aviles, "basically similar" or displaying the same characteristics, would seem to require just as much explanation as "consistent."  For purposes of this opinion, however, that is irrelevant.

[9]It should also be noted that, given courts' common acceptance of opinions such as those provided by Ms. Arbogast, it would not be possible to find that Defendants acted unconstitutionally in relying on those opinions themselves.

between two items of evidence.  Instead, he could only give an opinion that the items were similar and could have come from the same source.  [Doc. 216, Exh. 22]  Plaintiff, however, has provided no expert testimony showing that such a numerical or statistical percentage is needed to allow an expert to provide a "consistency" or "similarity" opinion.  Again, all he has submitted is bare argument of counsel.  Given the wide acceptance of similar opinion testimony by courts in this country, the Court will not hold the experts who provided opinions in this case to a higher standard that Plaintiff might prefer.  Furthermore, the Court will certainly not hold Defendants Fox and Spiers, two laypersons, to the standard suggested by Plaintiff.  The lack of ability to assign a  percentage figure of consistency or similarity to items of trace evidence, therefore, will play no part in the Court's determination of this case.

   **4.  Motive to Frame Plaintiff:**  Plaintiff argues that a jury could infer these three Defendants had a motive to frame him for Girly's murder.  His argument proceeds as follows: (1) Plaintiff opened a safety deposit box at a bank on September 9, 1999, and subsequently put some gold coins and currency in the box; (2) these items were seized pursuant to a search warrant later in 1999; (3) several of the gold coins subsequently disappeared from the Albuquerque Police Department's ("APD") evidence room, on December 5, 2000; (4) this disappearance gave Defendants a reason to try to pin Girly's murder on Plaintiff; and (5) shortly after December 5, 2000, Defendants turned their focus to Plaintiff and began treating him as a suspect in Girly's murder, for example by executing a search warrant against him a few days later.  Plaintiff contends the short time span between the coins' disappearance and Defendants' subsequent attitude and actions toward him would allow a jury to draw the inference of motive for which he argues.  Plaintiff's argument, however, founders on a lack of supporting facts and is premised on complete speculation.

14

As noted above, central to Plaintiff's argument is his contention that the coins disappeared around December 5, 2000.  However, there is no evidence to support that assertion. A report prepared pursuant to an APD investigation indicates the coins disappeared sometime between December 5, 2000, and February 12, 2003.  [Doc. 43, Exh. 13]  That same report indicates a person named Brent Johnson, identified by Plaintiff as Defendant Spiers' investigator, had checked out the coins and returned them to the evidence room on December 5.  [Doc. 216, Exh. 23]  When Mr. Johnson returned the coins, one version of events is that they were inventoried and were all accounted for; another version is that the detective in charge of the coins, Detective Gunther, failed to inventory them.  [*Id.*]  There is no evidence at all, however, that the coins were actually missing on December 5.  The jury would have to engage in sheer and impermissible speculation to determine the date the coins disappeared, and such speculation is not sufficient to ward off a motion for summary judgment.  *See Pinkerton v. Colorado Dep't of Transp.*, *supra*, 563 F.3d at 1061 (speculation and argument of counsel do not provide a sufficient basis to refuse summary judgment); *see also Six v. Henry*, 42 F.3d 582, 585 (10th Cir. 1994) (court properly dismissed claim where jury would have had to engage in sheer speculation and conjecture).[10]

It should also be noted that Plaintiff's argument for an inference of motive fails because it is illogical.  According to the evidence presented to the Court, none of the three named Defendants had any role in the disappearance of the coins.  Plaintiff has not explained why these

---

[10]Another issue about which the jury would have to speculate is Defendants' knowledge that the coins had disappeared, and when they obtained that knowledge.  Plaintiff presented no evidence at all concerning these issues; for all the Court can tell from the record, Defendants were never informed, during the time the case against Plaintiff was pending, that the coins had disappeared.  Again, a jury would not be allowed to speculate as to Defendants' knowledge any more than about the date the coins disappeared.  *See Independent-Eastern Torpedo Co. v. Ackerman*, 214 F.2d 775, 777 (10th Cir. 1954) (jury's "fact finding and inference drawing must be exercised in the realm of probability, not speculation, surmise and conjecture.").

15

Defendants would want to assist whoever stole the coins, if indeed they were stolen and not auctioned off by mistake, as the APD report suggests might have happened.  In addition, Plaintiff has not explained how framing him for the murder could possibly help cover up the loss of the coins, when those coins were intended to be used as evidence at any trial that might occur.  For all of the foregoing reasons, the Court rejects Plaintiff's attempt to establish a fact dispute as to whether the disappeared coins provided a motive for any or all Defendants to frame him. Although the evidence must be viewed in the light most favorable to Plaintiff, as noted above, "evidence" does not include speculative assertions or inferences.  *See Menne v. Celotex Corp.*, 861 F.2d 1453, 1463 (10th Cir. 1988).

   **5.  Steam Cleaner Evidence:**  Plaintiff argues that Defendants, particularly Defendants Fox and Spiers, erroneously decided that a steam cleaner belonging to Diazien Hossencofft had been used to clean Girly's carpet after she was abducted or murdered in her apartment.  Plaintiff points to evidence indicating the cleaner was on a moving van and in transit between Albuquerque and South Carolina during the time frame covering Girly's disappearance.  [Doc. 43, Exhs. 1, 2, 3, 4]  Despite this evidence, according to Plaintiff, Defendants Fox and Spiers persisted in using trace evidence from the cleaner to attempt to connect Plaintiff to Girly's apartment as well as the Magdalena tarp, and thereby to Girly's murder.  They each stated at one point or another that the evidence as to the cleaner's location was not conclusive.  Fox's theory was that Diazien could have removed the cleaner after it was tagged and inventoried by the moving company, used it to clean Girly's carpet, driven the cleaner to South Carolina, and then placed it into the house so the movers would inventory it again.  [Doc. 125, Exh. 38, pp. 55-56] There is no evidence that this occurred, the theory is simply supposition on Fox's part.  For summary-judgment purposes, therefore, it must be considered a fact that the cleaner was not in fact used to clean Girly's carpet.  In addition, a reasonable inference to be drawn is that

16

Defendants Fox and Spiers had some level of predisposition to reject evidence, such as the moving-van records, that was favorable to Plaintiff.

Plaintiff raises another argument concerning the steam cleaner that is much more tenuous. He points out that the cleaner did not contain any fibers from Girly's carpet, or any "sawdust-like material" that was found in Girly's carpet.  [Doc. 216, Exh. 7, pp. 124-25]  The cleaner did, however, contain other items of trace evidence that were of a similar nature to those found in Girly's carpet – items such as cat hairs, dog hairs, and dyed and undyed deer hair.  According to Plaintiff, the cleaner's lack of certain items from the carpet, together with the presence of other items, is evidence not only that the cleaner was not used to clean the carpet, but that someone planted the trace evidence in the cleaner.  The latter contention stretches the evidence too far and requires rank speculation.  Plaintiff has presented no evidence as to how anyone could have "salted the evidence" as he put it, and has certainly presented no evidence establishing that any of the three Defendants did so.  As the Court pointed out above, a jury is not entitled to engage in complete speculation, and that is what would be required to determine that any Defendant planted trace evidence in Diazien Hossencofft's cleaner.  Plaintiff's theory will therefore not be considered for summary-judgment purposes.[11]

---

[11]There is one obvious explanation for the similarities in items from the cleaner and the carpet – the cleaner was used to clean Diazien Hossencofft's carpet before he moved.  Diazien and Linda Henning were obviously both in his house often, and both have been placed at Girly's apartment by forensic evidence [Doc. 125, Exh. 26]  This means either one or both of them could have transported the trace evidence from Diazien's home to Girly's apartment, and shed that evidence there.  This explanation, however, like Plaintiff's theory, is not based on any evidence presented to the Court.  The Court points it out simply to counter Plaintiff's argument that the only possible explanation for the cleaner's trace-evidence contents is that they were planted there by someone.

**B.  Evidence and Argument Specific to Each Defendant**

In the following discussion of the individual Defendants' potential liability, the nature of
Plaintiff's claim must be kept in mind.  A constitutional malicious prosecution claim gives rise to
liability only if the acts of malicious prosecution result in some sort of seizure or confinement.
*Nielander v. Board of County Comm'rs of County of Republic, Kan.*, 582 F.3d 1155, 1164-65
(10th Cir. 2009); *Becker v. Kroll*, 494 F.3d 904, 914-15 (10th Cir. 2007).  In this case, the
confinement occurred when Plaintiff was arrested in February 2001, indicted in that same month,
and spent seven weeks in custody.  The relevant probable-cause inquiry, therefore, must be
primarily directed at what Defendants knew before the arrest, and what information was
improperly included in or excluded from the arrest warrant and February 2001 grand-jury
presentation.  Other issues, such as the existence of probable cause for a particular search warrant
or the presentation of evidence to the 2002 grand jury, are relevant only insofar as they might
tend to indicate intent on the part of Defendants.  In other words, if there is evidence that
evidence was fabricated during the 2002 grand jury proceedings, that evidence would be relevant
insofar as it might indicate Defendants' intent during the 2001 grand jury proceedings.

Another factor that must be kept in mind is the standard to be applied in fabrication-of-
evidence cases such as this one.  The parties agree that the Court's task is as follows:  (a)
determine if there is a question of fact as to whether certain items of evidence were fabricated;
(b) if so, eliminate those items of evidence from the probable-cause equation; (c) determine
whether exculpatory evidence was improperly excluded; (d) if so, include that evidence in the
equation; and (e) decide whether probable cause still exists, after this process has been
completed.  *See Grubbs v. Bailes*, 445 F.3d 1275, 1278 (10th Cir. 2006) (where false information
has been included in an arrest warrant and information has been omitted from that warrant, the
existence of probable cause is determined by setting aside the false information, including the

18

omitted information, and inquiring whether the affidavit would still have given rise to probable cause).[12]

     **1. Defendant Arbogast:**  Plaintiff does not contend that Ms. Arbogast had any decision-making role in the issuance of the February 2001 arrest warrant, or in deciding what evidence should be included and what excluded.  His claim against her is limited to an accusation that she fabricated evidence in support of that warrant and other warrants, in cooperation with Spiers and Fox.  This is a serious accusation; as the Court discusses below, there is no evidence in support of it, only argument and speculation by counsel.  Summary judgment will therefore be granted to Defendant Arbogast.

     In his current response brief, Plaintiff levels two major complaints against Arbogast.  The first is his contention that she engaged in "pseudo-science" by stating, in her reports and testimony, that certain items of trace evidence were consistent with standards obtained from Plaintiff or his home.  The Court has already rejected this argument and need not address it further.

     Plaintiff's second accusation is that Arbogast mis-labeled some items of trace evidence, and did so in order to conceal the fact that she was fabricating evidence.  On one page of her notes, describing evidence sent to the evidence unit on October 23, 2001, Arbogast labeled an

---

[12]The Court notes that all Defendants discuss the existence of probable cause for the February 2003 search warrant.  It is not necessary to address this warrant, for two reasons.  First, the 2002 grand jury refused to indict Plaintiff on the only charges relevant to this case, the conspiracy and kidnapping charges; therefore, the existence of probable cause or lack thereof for a subsequent search warrant is irrelevant to this case.  Second, the probable cause analysis should be performed not for search warrants, but only for the arrest warrant; search warrants do not directly cause a seizure or confinement, and therefore do not constitute a malicious prosecution of an individual.  In addition, in previous opinions the Court has already addressed the viability of any claims that might be based on the various search warrants executed in this case.  For this same reason, it is not necessary to apply the probable-cause analysis to the December 2000 search warrant, despite the fact that Defendant Spiers does engage in such an analysis in his brief.

evidence "card" as being "trace coll @ K117 (silver honda) and K118."  [Doc. 216, Exh. 2]  On

the same page, she a labeled a different card as being carpet standards from Plaintiff's home, and

denominated the standards as K117, K118, K119, and K120.[13]  Plaintiff attributes nefarious

purposes to this double-labeling, but his accusation is based on total speculation.  Earlier in

Arbogast's notes, she clearly identified K117 - K120 as carpet standards obtained from Plaintiff's

home; that identification occurred in December 2000.  [Doc. 212, Exh. 10, p. 35]  On the same

page of her notes, she discussed (in difficult-to-decipher shorthand) her examination of K117,

K118, K119, and K120, which also took place in December 2000.  [*Id.*]  Plaintiff has pointed to

no other place in Arbogast's notes where K117 or K118 were identified as coming from a vehicle

rather than Plaintiff's home.  Therefore, at the time most crucial to the case, just before the arrest

warrant was issued, the only evidence is that K117 and K118 were carpet samples taken from

Plaintiff's home.  The fact that Arbogast subsequently mis-labeled one of her evidence cards,

after she had already testified before the 2001 grand jury and provided her analyses to Defendants

Fox and Spiers, cannot give rise to the inference of fabrication Plaintiff seeks to draw.  In fact,

the Court must confess a great deal of difficulty even following Plaintiff's cryptic argument, and

does not find it logical that a subsequent double-labeling of evidence cards can somehow indicate

fabrication of evidence at an earlier date.  Perhaps Plaintiff might have established an issue of

fact on this issue if he had questioned Arbogast under oath at a deposition; however, he has

provided no transcript of such a deposition for the Court's review.

Plaintiff's brief mentions one other event that somehow, according to him, indicates

Arbogast was fabricating evidence.  He points out that following execution of a search warrant in

December 2000, Arbogast prepared slides of green/black feathers taken from Plaintiff's son's

---

[13]"Standards" are items that are to be used for comparison purposes.  For example, if a
human hair is found at a crime scene, a hair might be taken from the suspect to be used as a
standard, for comparison to the hair found at the scene.

fishing-tackle box.  [Doc. 216, Exh. 2, p. 53]  He then notes that these feathers allowed

Defendant Spiers to claim that one analysis showed a consistency between these feathers and a

feather found on the Magdalena tarp.  However, that analysis was performed by Mr. Aviles, the

forensic scientist mentioned above in the section concerning the use of the term "consistent."

[Doc. 125, Exh. 33]  Plaintiff does not contend that feathers were not in fact found in the tackle

box, and points to no other way in which Defendant Arbogast might have committed wrong-

doing with regard to the feathers.  The creation of these evidence slides, therefore, cannot be

considered evidence that Arbogast fabricated evidence.[14]

       Plaintiff's current brief discusses no other facts concerning Defendant Arbogast.

However, as noted above the Court has reluctantly performed the job of Plaintiff's counsel and

reviewed the evidence submitted to determine whether sufficient disputed facts exist to allow a

fact-finder to decide Arbogast engaged in fabrication of evidence.  One potentially significant

event occurred during her grand jury testimony in February 2001.  She testified that she had

compared a hair found on the Magdalena tarp to samples of Plaintiff's hair, and found they were

consistent.  [Doc. 43, Exh. 15]  Approximately two weeks before her testimony, however, a

---

[14]The Court notes that in an earlier response brief, Plaintiff accused Defendant Arbogast
of lying under oath because at the 2002 grand jury proceedings, she testified about the tests Mr.
Aviles had performed on the feathers.  [Doc. 110, Exh. D, pp. 357-59]  She accurately described
the results of those tests, which showed the feather from the tarp and the feathers from the tackle
box displayed the same physical, microscopic, and optical characteristics.  [Doc. 125, Exh. 33]
After stating the feathers were a physical and chemical "match" she added, perhaps
unfortunately, that "they're the same."  [Doc. 110, Exh. D, p. 359]  It is not clear whether she
was saying the feathers were the same, or the test results for the feathers were the same; if the
former, her statement was wrong, as Mr. Aviles concluded only that the feathers could have
originated from the same source.  [Doc. 125, Exh. 33]  It should be noted that this possible
mischaracterization of the test results occurred in 2002, and therefore had no effect on the 2001
grand jury's indictment.  Furthermore, the 2002 grand jury was obviously not misled by the
statement, since it refused to indict Plaintiff on the conspiracy or kidnapping charges.  For
purposes of summary judgment, however, the Court will consider Plaintiff's statement an
example of mischaracterization of evidence.

laboratory at the University of North Texas had issued a report concerning DNA testing of certain evidence, including the hair found on the tarp, and excluded Plaintiff as a possible source of that hair.  [Doc. 43, Exh. 16]  If Plaintiff had presented any evidence at all indicating that Arbogast knew about the laboratory's results before she testified, her failure to mention those results in her testimony could be troubling.[15]   However, no such evidence has been presented.

The report was submitted by the laboratory to Catherine Dickey, a different forensic scientist employed by APD.  [*Id.*]  She then apparently faxed a copy of the report to Defendant Spiers.  [*Id.*]  There is no evidence that either Spiers or Dickey or anyone else told Arbogast about the negative test results, and it does not appear the report was submitted to the 2001 grand jury for its consideration, a fact that will be discussed later in the Fox and Spiers sections of this opinion. Plaintiff would have the fact-finder assume that because Arbogast worked in the same division as Dickey, and was working on the same case, she was informed of the results of the laboratory testing.  The only thing that can be assumed, however, is that she should have been informed of those results before she testified.  If there was any testimony from either Dickey or Arbogast to the effect that they shared information about the case with each other as a matter of course, or something similar about their usual practices, the inference Plaintiff argues for would be acceptable.  As the record stands now, however, there is no evidence upon which a jury could base a finding that Arbogast knew about the laboratory results at the time she testified. Plaintiff's accusation that Arbogast lied during her testimony, by failing to mention the negative DNA results, is therefore unfounded.[16]

_____

[15]The Court notes that in a deposition-like sworn statement given later, in July 2001, Arbogast did discuss her comparison of the hairs and finding of consistency, but immediately stated that DNA testing had shown the hairs were not a match.  [Doc. 110, Exh. D, p. 62]

[16]It should also be noted that the fact that DNA testing found no match between the hairs does not mean that a physical comparison, such as the one Arbogast performed, could not result in a finding of consistency.  *See, e.g., Parker v. Sirmons*, 237 Fed.Appx. 334, 336 (10th Cir.

22

In the earlier briefs Plaintiff also raised an issue concerning Arbogast's test results showing that two cat hairs found on the tarp were consistent with the characteristics of Plaintiff's cats.  [Doc. 110, Exh. D, p. 352]  Plaintiff attacked this testimony, arguing that Arbogast herself had stated there is no "form" developed for analyzing and comparing cat hairs.  This is a mischaracterization of Arbogast's statement.  What she actually said was that the examination form had not yet been developed to perform animal-hair comparison "to the extent that we do the human hair comparison."  [*Id.*]  Arbogast specifically explained to the grand jury that she performed "what we call limited comparison, because animals don't have as many characteristics as human hairs do..."  [*Id.*]  No inference of fabrication can be drawn from this testimony.[17]

Plaintiff has consistently implied that Defendant Arbogast participated in a plan to plant trace evidence into Diazien's steam cleaner.  As the Court noted above, there is no evidence supporting this allegation.  All Plaintiff can point to in support is the evidence that the cleaner was not in fact used to clean Girly's carpet, yet contained trace evidence similar to that found in the carpet.  As the Court noted above, this is not enough to raise an inference of evidence "salting."  Specifically with respect to Defendant Arbogast, the only evidence is to the effect that she was given the task of analyzing trace evidence found in the cleaner, and carried out that task. No evidence supports the implied accusation against her of planting evidence.

In sum, the only allegation against Defendant Arbogast that is supported by evidence is that she mischaracterized Mr. Aviles' findings concerning the feathers, thereby exaggerating the impact of those findings.  That action, however, had no impact on Plaintiff, because the 2002

---

2007) (fact that DNA evidence resulted in opposite finding to physical comparison of hair did not suggest that forensic scientist's testimony concerning the hair fragment analysis was false; different results possible from these tests).  In other words, it cannot be inferred that Arbogast's consistency finding was fabricated simply because the DNA test contradicted that finding.

[17]The Court also notes that this testimony was given to the 2002 grand jury, not the 2001 grand jury which is the main focus of inquiry in this case.

grand jury refused to indict him on the relevant charges.  The only other possible shortcoming in Arbogast's testimony is her failure to mention the DNA results excluding Plaintiff as a donor of the one hair found on the tarp.  As the Court discussed above, however, there is no evidence she knew of those results when she testified before the 2001 grand jury; it is not enough to argue she "must have" known about them, and it would have been a simple matter to ask her whether she did have such knowledge.  These incidents are simply not a sufficient basis for a jury to find  that Arbogast conspired with the other Defendants to fabricate evidence in an effort to create probable cause where none was present.  Specifically, there is no direct evidence that Arbogast conspired with anyone else; therefore, Plaintiff's conspiracy claim against her depends on circumstantial evidence.  Absent any evidence that she actually fabricated evidence, one instance of exaggerating another expert's findings and another instance of omitting mention of evidence she may or may not have known about, are not a sufficient basis to allow an inference of conspiracy. *Cf. United States v. Migliaccio*, 34 F.3d 1517, 1521-22 (10th Cir. 1994) (reasonable juror could not find existence of conspiracy under evidence presented).  The Court therefore finds it unnecessary to perform the probable-cause test of excluding this evidence and deciding whether there was probable cause without it.[18]  Summary judgment will be granted to Defendant Arbogast.

**2. Defendant Spiers:**  As Plaintiff argues, Defendant Spiers was a supervising figure in the investigation of Girly's murder and therefore played a much larger role than did Defendant Arbogast.  On the other hand, as the Court has already held, as a prosecutor Spiers possesses absolute immunity for his work presenting evidence to the 2001 and 2002 grand juries. *See, e.g., Guttman v. Khalsa*, 446 F.3d 1027, 1034 (10th Cir. 2006).  This is true even if it were true that

---

[18]The Court notes that if it were to perform that analysis, it would find the absence of the hair evidence would not vitiate probable cause; it was just one piece of evidence out of many marshaled against Plaintiff.

he knowingly allowed false testimony to be presented to the grand juries, and knowingly failed to present exculpatory evidence.  *Id.*  Recognizing this, Plaintiff focuses solely on Spiers' involvement in the investigation of the crime, for which no absolute immunity is accorded to a prosecutor.  *See Mink v. Suthers,* 482 F.3d 1244, 1259 (10th Cir. 2007).

Defendant Spiers did take part in the investigation to a certain extent; for example, he participated in the execution of certain search warrants, was the source of directions to Arbogast as to what materials to test for trace evidence, and was kept in the loop regarding the results of those tests.  Furthermore, at least in Defendant Fox's view, Spiers and Fox were jointly in charge of the investigation.  [Doc. 125, Exh. 37]  However, Plaintiff appears to argue that Spiers must have known and authorized every detail of every piece of evidence that was used in the arrest warrant, or presented to the grand jury, or withheld from the grand jury, simply because he was a leading figure in the investigation.  This blanket assertion of knowledge cannot prevail, as it is tantamount to imposing liability on the basis of respondeat superior rather than on Spiers' own actions.  Under § 1983 this is not permissible.  *See Porro v. Barnes,* 624 F.3d 1322, 1327 (10th Cir. 2010) (no respondeat superior or supervisory liability under § 1983; liability is based on defendant's own conduct).   On the other hand, the claim in this case is a conspiracy claim, not an ordinary § 1983 claim, and co-conspirators may be held responsible for each others' actions.  *See White v. McKinley*, 519 F.3d 806, 814 (8th Cir. 2008) (to prove § 1983 conspiracy claim, plaintiff must establish, *inter alia*, that at least one of the alleged co-conspirators engaged in an overt act in furtherance of the conspiracy).  Furthermore, in a § 1983 claim, a supervisor is liable for the acts of his subordinates if the supervisor participated in or directed the violations, or knew of the violations and failed to act to prevent them.  *Lowery v. County of Riley*, 522 F.3d 1086, 1092-93 (10th Cir. 2008).  Of course, a prosecutor is not liable for actions that are protected by absolute immunity, even when a conspiracy claim has been brought.  *See Reasonover v. St. Louis*

25

*County, Mo.,* 447 F.3d 569, 580 (8th Cir. 2006).  The bottom-line inquiry with respect to Spiers, therefore, is whether there is evidence from which a jury could conclude he conspired with Defendant Fox to fabricate evidence, whether any of his actions with respect to the conspiracy are not protected by absolute immunity, and (assuming there is evidence of conspiracy) whether the actions of Spiers and Fox resulted in Plaintiff's arrest and incarceration in the absence of probable cause.

As the Court did with respect to Defendant Arbogast, the Court will review each of Plaintiff's allegations that concern Spiers with the above questions in mind.  In doing so, for ease of discussion, the Court will assume Fox's actions can be attributed to Spiers as part of the alleged conspiracy; this will avoid the necessity of analyzing the relevance of each piece of evidence both as to the conspiracy question and as to the fabrication issue.

The Court notes Spiers' argument that he is absolutely immune for any conduct associated with the February 2001 arrest warrant, because he did not attest under oath to any of the facts stated in that warrant.  This argument raises a difficult question.  A prosecutor is absolutely immune for a decision to initiate a criminal case.  *Kalina v. Fletcher*, 522 U.S. 118, 129-31 (1997).  On the other hand, a prosecutor is not entitled to such immunity for the act of submitting an affidavit in support of an arrest warrant.  *Id.*  What Spiers allegedly did in this case is conspire to fabricate evidence that would then be cited in the arrest-warrant affidavit.  Plaintiff did not respond to this argument, except to assert the general principle that a prosecutor is not absolutely immune for investigative activities.  For purposes of this motion, the Court finds that fabricating evidence, and then allowing that evidence to be used in an affidavit to support an arrest warrant, is akin to attesting to the facts found in such a warrant, and that absolute immunity is not available for such conduct.  The Court therefore analyzes the evidence rather than simply according absolute immunity to Spiers.

Many of Plaintiff's complaints about Spiers have been addressed above – his reliance on contaminated evidence, his acceptance of Arbogast's conclusions about "consistent" evidence, the missing coins as an alleged motive to frame Plaintiff, his refusal to consider Plaintiff's alibis as conclusive, and his reliance on evidence obtained from the steam cleaner.  As discussed above, only the steam-cleaner issue raises a genuine issue of material fact for summary-judgment purposes.  In performing the probable-cause analysis, therefore, the Court will omit all evidence obtained from the steam cleaner.

Plaintiff has presented evidence that both Spiers and Fox had an intention to make Plaintiff as anxious as possible, in order to make him more willing to provide information that could help the investigation.  [Doc. 125, Exh. 27]  A jury could conclude this provided a motive to view the evidence in a light adverse to Plaintiff, and to ignore evidence that might tend to exculpate him; for purposes of this motion the Court will assume Spiers and Fox did have such attitudes.

Plaintiff contends Spiers directed Arbogast to fabricate evidence concerning the "consistency" between the feather found on the tarp and the feathers found at Plaintiff's residence.  He also complains that Spiers ignored the fact that Plaintiff's son was not using that color of feather for fly-tying purposes in September 1999.  There is no evidence that Spiers directed Arbogast to say anything about the feathers.  Furthermore, there is no evidence Spiers was told anything about who used what color feathers in 1999; Plaintiff's evidence on that subject comes from his affidavit of July 15, 2010, which is obviously long after the events in question.  This is no basis on which to claim fabrication of evidence.

Although Plaintiff argues that the Hess business card and other cards are not part of his conspiracy claim, he nevertheless complained in his brief about the significance Spiers and Fox

placed on these cards.  Since they have no relevance to the conspiracy and Plaintiff did not obtain a favorable termination with respect to them, the Court will not consider his arguments.

Plaintiff also argues that Spiers helped fabricate evidence concerning the notebook he had in his possession at the time of his arrest, which became the subject of one tampering-with-evidence charge.  He complains that Spiers asked a leading and suggestive question concerning that notebook, by stating first that the notebook was destroyed and only then correcting himself to ask, again falsely, whether it was thrown or tossed.  According to Plaintiff, there has never been evidence to support either suggestion.  As this allegation concerns Spiers' conduct in front of the grand jury, he is absolutely immune with respect to the allegation.  Furthermore, as discussed above Plaintiff did not obtain a favorable termination of the charge that resulted from this incident, so as a matter of law it cannot be considered part of his conspiracy claim.

Plaintiff accuses Spiers of soliciting false testimony from Detective Gonzales, concerning the Linda Henning business card that may or may not have been found in Plaintiff's fireplace.  Plaintiff contends the card never existed.  As with the notebook incident, the business-card incident is not part of Plaintiff's conspiracy claim, and is barred as a matter of law due to lack of a favorable termination of the resulting charge.  Furthermore, Spiers is absolutely immune for his alleged conduct in soliciting false testimony during grand jury proceedings.  Finally, there are significant problems with the current claim by Plaintiff's counsel that the business card never existed.  Plaintiff himself, testifying before the 1999 investigative grand jury, admitted that it did exist; he testified that it was in the fireplace because he periodically goes through his papers and burns those he no longer needs.  [Doc. 214, Exh. 2]  Even his latest submission, his affidavit of July 2010, does not claim the card never existed – he avers only that he did not intentionally burn the Linda Henning card, and then mischaracterizes his 1999 grand jury testimony by saying he admitted only to having the card in the top drawer of his kitchen cabinet.  [Doc. 216, Exh. 1]  In

28

the face of this sworn testimony from Plaintiff himself, Plaintiff will not be allowed to argue the card never existed – this is an example of severe overreaching by Plaintiff's counsel.  *See, e.g., Lantec, Inc. v. Novell, Inc.*, 306 F.3d 1003, 1016-17 (10th Cir. 2002) (sham issue of fact cannot be created with a later affidavit that contradicts prior sworn testimony).  At best, for summary-judgment purposes, the Court will accept Plaintiff's affidavit testimony that the card was in the kitchen drawer, not the fireplace.

Plaintiff also accuses Spiers of allowing Fox to lie about the burned business card.  It is true there is evidence from which a jury could conclude that Fox told a lie that concerned the business card.  At a court hearing in 2003, Fox attempted under oath to correct statements he had made earlier about the card.  [Doc. 214, Exh. 4, pp. 2-3]  In his prior statements he had apparently said he was not in the area of the fireplace when the card was found, was not part of that search, and did not see the business card on that day.  [*Id.*]  During the 2003 hearing, however, he corrected those statements and testified that he now recalled being at the scene and seeing the business card laid out on a piece of paper next to the fireplace.  [*Id.*]  A jury could easily conclude this was a lie told in an attempt to save this particular tampering charge from dismissal.  The detective who allegedly found the card, Detective Gonzales, passed away a few months after the search in question.  Without his testimony, it would be difficult to establish the facts needed to convict Plaintiff on that charge.  Fox's sudden change of memory about the card could seem a little too convenient to be believable, and a jury could choose to disbelieve it.  Given the other evidence concerning the existence of the card, including Plaintiff's own sworn testimony, the Court considers Fox's alleged lie to be evidence, not that the card did not exist, but that Fox was willing to lie to prove a criminal charge against Plaintiff.[19]  It must be pointed

---

[19]This conclusion is bolstered by the fact that Fox testified in 2006, at his deposition, that he still believes Plaintiff got away with murdering Girly Hossencofft.  [Doc. 212, Exh. 7]  Someone feeling that way might easily have a desire to make as many charges as possible stick

out, however, that Spiers was not present at the 2003 hearing in which Fox told his alleged lie. In addition, if Plaintiff is arguing that Spiers "allowed" Fox to lie during a grand jury proceeding or other court hearing, Spiers has absolute immunity for such action.

Plaintiff understandably attempts to emphasize Fox's lie and utilize it to the greatest extent possible. He contends that the lie places Fox's credibility into issue, and creates an issue of fact about every statement Fox made in the arrest-warrant affidavit (and all other warrants, for that matter). In other words, he argues Fox lied once, so could have lied more than once, so questions of fact are automatically raised concerning all of the factual recitations Fox made in his affidavits in support of warrants. Plaintiff cites no authority for this broad assertion; the authority the Court has found indicates Plaintiff cannot avoid summary judgment by arguing that one lie puts an entire affidavit at issue. *See, e.g., United States v. Robinson*, 272 Fed.Appx. 421, 428 n. 1 (6th Cir. 2007). In *Robinson*, the defendant made an argument similar to Plaintiff's in this case -- he argued that a warrant should be found invalid because the presence of false statements in the warrant affidavit meant the issuing magistrate, if he had known about the false statements, might have found the officer totally lacking in credibility and refused to issue the warrant. The Sixth Circuit rejected this argument, stating the approach "would be equivalent to holding that the mere presence of false statements is sufficient to invalidate the warrant. That is not the law." *Id.* The Sixth Circuit correctly pointed out that the appropriate approach is not to invalidate an entire warrant due to false statements found therein; instead, a court must excise the false statements and then determine whether probable cause still exists. *Id.* As discussed above, that is also the standard in the Tenth Circuit for analyzing false statements in warrant affidavits.

---

against Plaintiff. On the other hand, it should be noted this possible motivation to lie did not exist in 2001, at the time of the arrest warrant and grand jury proceedings; Plaintiff was still facing charges related to the murder and kidnapping and there was no indication he was "getting away" with anything at that point.

Plaintiff's argument must therefore be rejected, as it would automatically create an issue of fact concerning probable cause simply because a warrant affiant has been caught in one lie.  Instead, it is incumbent on Plaintiff to present evidence tending to show that specific statements Fox made in the arrest-warrant affidavit were false.[20]

In one of Plaintiff's prior briefs, he raised a somewhat-related argument, contending the arrest warrant was largely based on Defendant Fox's recitation of what third parties had told him. Plaintiff attacked the affidavit and Spiers' approval of it by contending Fox was a proven liar. Again, however, this blanket denunciation of the warrant affidavit is not sufficient.  As  the Court just pointed out, Plaintiff could have provided evidence from the  individuals Fox had allegedly spoken to, contradicting his claims; however, the Court has not been directed to such evidence. For example, in the arrest-warrant affidavit Fox stated that a Mr. Wilkin and a Ms. Staehlin had both told Fox the same thing – that Plaintiff told each of them Diazien Hossencofft wanted Plaintiff to kill Girly.  [Doc. 214, Exh. 15]  Plaintiff has presented no evidence from either Mr. Wilkin or Ms. Staehlin that might undermine Fox's account of their statements.[21]  Another example is Fox's recitation in the affidavit of testimony supposedly provided to the 1999 investigative grand jury.  Again, it would be a simple matter to review the transcript of those

--------

[20]The Court notes that for many of the statements this would not have been a difficult task should Plaintiff have attempted to undertake it.  The arrest warrant affidavit contains many instances of Defendant Fox repeating statements made to him by other individuals.  It should not have been difficult for Plaintiff to find at least some of those individuals and obtain affidavits or deposition testimony from them, contradicting what Fox claimed they told him.

[21]Plaintiff has apparently attempted to do so in his August 2006 affidavit, in which he claims he never told anyone that Diazien Hossencofft asked him to kill Girly.  Whether he actually told anyone this or not, the only evidence in the record at this point is that both Mr. Wilkin and Ms. Staehlin told Fox that he did make such a statement.  Even if they were lying to Fox, or mistaken about what Plaintiff actually said, that does not impact the validity of Fox's statements in the affidavit; he did not claim Plaintiff actually made the statements to Wilkin or Staehlin, only that they told him he did.

31

grand jury proceedings and determine whether Fox accurately related what the witnesses told the grand jury.  The Court will not simply reject the arrest-warrant affidavit because Fox often recites second-hand statements or information.  *See Clanton v. Cooper*, 129 F.3d 1147, 1155 (10th Cir. 1997) (probable cause necessary to support arrest warrant exists even where affidavit relies exclusively on hearsay statement); Rule 1101(d)(3), Federal Rules of Evidence (evidence rules do not apply to arrest warrants or search warrants).  This is true despite his alleged credibility issues, as discussed in the preceding paragraph.

Plaintiff complains that Spiers allowed Fox to lie about the purchase of a Taurus handgun which Plaintiff later sold or gave to Diazien or Linda Henning.  Fox apparently testified that Plaintiff purchased the gun at an establishment called Quartermasters; in fact, Plaintiff purchased it from a private individual.  [Doc. 125, Exh. 24]  It is not clear to the Court what significance this discrepancy has; however, for purposes of the probable-cause analysis, the Court will ignore the source of the gun.

According to Plaintiff, Spiers knew Catherine Dickey was lying during her testimony at a grand jury proceeding and at Linda Henning's trial, when she testified she was unable to perform a DNA test on certain stains present on Girly's carpet pad.  Spiers has absolute immunity for his presentation of evidence to both tribunals.

Long after the arrest warrant was issued in this case, Diazien gave a statement that implicated Plaintiff in Girly's murder.  Plaintiff points out that Spiers knew Diazien was a liar and should have ignored his accusation.  This is a spurious assertion.  Even if an individual is a known liar, and has a reason to deflect blame from himself, a prosecutor or law enforcement officer cannot simply ignore that individual's statements blaming someone for a serious crime.  This is especially true where, as here, Diazien provided one piece of information that, while far from conclusive, could be corroborated to a limited extent.  That is, Diazien stated that Plaintiff

32

had followed Girly home from a WalMart store, and Fox was able to discover that Girly had written a check to WalMart during a time frame that would generally fit Diazien's accusation. [Doc. 212, Exh. 7, pp. 163-64]

Plaintiff asserts Fox lied about Plaintiff's alibi for September 10, 1999.  Plaintiff stated that he worked on a pool or pond on that date, for a Ms. LaFlamme.  In the arrest-warrant affidavit, Fox included Plaintiff's claim, but then alleged that Ms. LaFlamme had told the investigative grand jury that she thought Plaintiff worked for her on the 11th and not the 10th. [Doc. 214, Exh. 15]  There is no evidence that Ms. LaFlamme did not make this statement to the grand jury.  Again, although Ms. LaFlamme may have been mistaken, it was not improper for Fox to include her grand jury testimony in the affidavit.

One of Plaintiff's major allegations against Spiers (and Fox, for that matter) is that Spiers failed to include important exculpatory information in the arrest-warrant affidavit, and failed to present that information to the 2001 grand jury.  That information consists of two forensic-evidence reports received by Spiers before the arrest warrant was issued and the grand jury proceedings began.  The first was a criminalistics DNA report prepared by Catherine Dickey, a forensic scientist employed by APD.  According to this report, Plaintiff was excluded as a donor of any of the blood stains found at Girly's apartment, on the tarp, or on the clothing found near the tarp.  [Doc. 125, Exh. 26]  The second was a report from the University of North Texas, dated February 8, 2001.  This report analyzed a number of hair fragments, including the one that Defendant Arbogast determined was consistent with Plaintiff's hair, and determined that Plaintiff could be excluded as a donor of any of the hair fragments that could be tested.  [Doc. 43, Exh. 16]  Plaintiff complains strenuously about the exclusion of this exculpatory evidence from the warrant affidavit and the grand jury presentation.  As to the grand jury, Spiers is absolutely immune from any claim that he suppressed exculpatory evidence.  *See Bernard v. County of*

33

*Suffolk*, 356 F.3d 495, 503 (2d Cir. 2004).  For purposes of the arrest warrant, the Court will include this exculpatory information in the probable-cause analysis, in accordance with the rule that improperly-excluded evidence must be considered for purposes of a lack-of-probable-cause claim.  This inclusion will necessarily mean omitting Arbogast's conclusion that Plaintiff's hair was consistent with a hair found on the tarp.

The foregoing discussion brings us to the crucial determination – excluding evidence that should not have been included in the arrest-warrant affidavit, and including evidence that should have been included, was there still probable cause to arrest Plaintiff for the murder of Girly Hossencofft?  *See Grubbs v. Bailes*, *supra*, 445 F.3d at 1278 (citing standard to be applied in cases such as this one).  As discussed above, the Court will exclude the tarp hair, all evidence found in the steam cleaner, all evidence of business cards except the fact that Plaintiff possessed one of Linda Henning's cards, and the source of the Taurus gun.  The Court will include the fact that none of Plaintiff's blood was found on the carpet or at the Magdalena location, and that no hairs that were able to be tested matched Plaintiff's.

The arrest-warrant affidavit included the following relevant evidence:  (1) Plaintiff told Rick Carlson to shut up when Carlson asked about Girly on September 14, 1999; a few days later he told Carlson he knew much more about what was going on in the case than was in the news; (2) Carlson was in constant fear of Plaintiff during this time period; (3) Plaintiff sold a handgun to Diazien, gave a shotgun to Linda Henning, and sold her a handgun as well; (4) Mr. Wilkin and Ms. Staehlin both informed Fox that Plaintiff told them Diazien wanted Plaintiff to kill Girly; (5) Plaintiff was friends with both Diazien and Henning, and had taken them target-shooting; (6) Plaintiff knows the Magdalena area well, from hunting trips there; he has friends in the area, and took Henning to that area in the month or two before Girly was murdered; (7) the tarp and clothes containing Girly's DNA, as well as other trace evidence, were found in the Magdalena area; (8)

Plaintiff went to a bank on September 9, 1999 to open a safety deposit box; however, when he saw a uniformed APD officer enter the bank, he became extremely nervous and left suddenly without depositing anything into the box; a few days later, he returned and placed coins and currency into the box; (9) Plaintiff owned two cats in September 1999; (10) Linda Henning told her cellmate that Plaintiff was with "us" and did most of the work, and the duct tape used in the incident came from Plaintiff's truck; (11) Diazien Hossencofft told his cellmate that he killed Girly and disposed of her body while "someone else" drove in the opposite direction with her clothes; (12) before Girly went missing, Plaintiff called Ms. Staehlin and asked her to go out of town with him the weekend of September 10, 1999; (13) the following items of trace evidence were found in Plaintiff's home during various searches:  natural and dyed deer hair, including pink deer hair; natural and dyed rabbit hairs; natural and dyed feathers; and natural cat hairs; (14) trace evidence collected from the tarp included two dyed rabbit hairs, two dyed green feathers, and one hundred and one cat hairs; (15) trace evidence collected from Girly's carpet included sixty cat hairs, eighteen natural deer hairs, six dyed deer hairs, one natural rabbit hair, five dyed rabbit hairs, eleven natural feathers, and one pink feather; and (16) the pink dyed deer hair located in Girly's carpet appeared to be consistent with the pink dyed deer hair collected from Plaintiff's residence.   To this evidence must be added the exculpatory evidence that was excluded from the warrant – none of Plaintiff's blood or hair was found in Girly's carpet, or on the tarp, or on the clothing found at the same location as the tarp.  In addition, Plaintiff had alibis for significant portions of September 9, 1999, and September 10, 1999.

Even with the exculpatory evidence included, the arrest-warrant affidavit contains sufficient facts to provide probable cause to arrest.  Henning's statement to her cellmate, that Plaintiff assisted her and someone else in the murder, is the statement of a co-conspirator or co-participant in the crime; as such, that statement alone could provide probable cause to arrest

Plaintiff.  *See, e.g., United States v. Vazquez-Pulido*, 155 F.3d 1213, 1216  n.5 (10th Cir. 1998)

(finding of probable cause to support an arrest may be based on a co-defendant's hearsay

statement, in whole or part).  Statements made by suspects to cellmates are often considered

trustworthy and may even support a conviction.  *See, e.g., United States v. Taylor*, 592 F.3d

1104, 1108-09 (10th Cir. 2010) (defendant argued no evidence linked him to carjacking victim's

vehicle; testimony of defendant's cellmate found to provide sufficient link to the carjacking).

The Court notes that in Henning's statement she did not exculpate herself; she indicated she also

participated in the murder with Plaintiff and another person.  Such a self-inculpatory statement

by a co-participant is sufficient to supply probable cause for arrest.  *See, e.g., United States v.

Patterson*, 150 F.3d 382, 386 (4th Cir. 1998) (unless it is incredible or contradicts known facts to

such an extent that no reasonable officer would believe it, a co-defendant's statement that he and

the suspect committed the crime supplies probable cause for arrest).

       As Plaintiff argues, Spiers had some reason to discount statements made by Henning

during the period leading up to Plaintiff's arrest.  However, in addition to that statement, the

arrest-warrant affidavit pointed out trace evidence linking Plaintiff's residence to both Girly's

carpet and the tarp found in the Magdalena area.  The most significant trace evidence, of course,

is the dyed rabbit hair, dyed deer hair, and dyed feathers.  Dyed animal hair and feathers do not

occur naturally, and a reasonable police officer could believe it was not a coincidence to find

dyed hair at crime scenes and at a suspect's residence.  This trace evidence clearly corroborated

Henning's assertion to her cellmate that Plaintiff was with her during the incident.

       The other facts recited in the arrest-warrant affidavit provide less of a direct connection

between Plaintiff and the crime, but still provide some support for a finding of probable cause.

As noted above, Plaintiff became extremely nervous on September 9 when he saw an APD

officer appear at his bank; he told Rick Carlson he knew more about Girly's disappearance than

36

was in the news; he had previously provided firearms to both Diazien and Henning, and taken

them target shooting; he was familiar with the area where the tarp and clothing were found, and

had taken Henning to that area within a month or two of Girly's murder; and two different

individuals informed Fox that Plaintiff told them Diazien wanted Plaintiff to kill Girly.  This

evidence of his connections to Diazien and Henning as well as to the location of the tarp and

clothing, coupled with his highly unusual behavior at the bank during the relevant time period

and his assertion of "inside knowledge" concerning Girly's disappearance, may not have been

sufficient, standing alone, to provide probable cause.  However, taken in conjunction with the

trace evidence and Henning's statement to her cellmate, the evidence was such that a reasonable

police officer could believe there was a substantial probability that Girly had been murdered and

that Plaintiff had played a role in the crime.  *See Taylor v. Meacham*, 82 F.3d 1556, 1562 (10th

Cir. 1996) (reciting probable-cause standard).

   This conclusion is not undermined by the fact that no blood or hair belonging to Plaintiff

was found at any location or item connected to the crime.  Other evidence tying him to the crime

was recited in the affidavit; although the lack of blood or hair evidence is exculpatory to a certain

degree, it does not vitiate the probable cause provided by the affidavit.  Plaintiff could have been

at Girly's apartment but not sustained any injuries drawing blood, and could have assisted in the

crime without leaving hair on the tarp.[22]  This was not a case, such as a rape case, where the

perpetrator would almost certainly leave behind DNA evidence.  *Compare Burke v. McDonald*,

572 F.3d 51, 54, 60 (1st Cir. 2009) (perpetrator of murder left bite marks and saliva on victim's

body; DNA tests excluding suspect meant probable cause was lacking).  Therefore, including the

---

   [22]It is also true, as Defendants argue, that the DNA evidence concerning the hair does not
absolutely exclude Plaintiff as a possible donor of the hairs submitted for testing.  A number of
the hair fragments were too small to yield sufficient DNA for testing purposes.  [Doc. 43, Exh.
16]

omitted test results in the affidavit would not have eliminated probable cause to arrest Plaintiff for conspiracy or kidnapping.[23]

For the foregoing reasons, the  Court will grant summary judgment to Defendant Spiers.

**3.  Defendant Fox:**  Most of the misdeeds attributed to Defendant Fox have been discussed above.  The only difference in the analysis between him and Defendant Spiers is that Fox, as a complaining witness rather than a prosecutor, is not absolutely immune for his testimony before either of the grand juries.  Plaintiff, however, has not pointed to any grand-jury testimony provided by Fox, other than the instances discussed above, that was false or misleading or that has any relevance to the probable-cause analysis.  For that reason, that analysis is the same for Fox as  it is for Spiers.  Excluding the same evidence as the Court did for Spiers, and including the information that should not have been omitted, the Court reaches the same result – the arrest-warrant affidavit, as amended, still provided probable cause for Plaintiff's arrest. Therefore, the malicious-prosecution claim against Fox fails to survive summary judgment.

**III. CONCLUSION**

Plaintiff has introduced evidence from which a jury could conclude Defendants Spiers and Fox (but not Arbogast) were predisposed to find the existence of evidence inculpating Plaintiff (such as the steam cleaner), and to ignore exculpatory evidence (such as the DNA test results).  Plaintiff has also introduced evidence from which a jury could conclude that Defendant Fox lied under oath.  However, in order to state a claim for a constitutional violation, Plaintiff was required to produce some evidence that these Defendants fabricated evidence, and that

---

[23]The Court notes Plaintiff did not perform the analysis set out in the case law, under which the arrest-warrant affidavit is examined after excluding facts that should not have been considered and including information that should not have been omitted.  Plaintiff apparently chose to stand on his arguments that the trace evidence was worthless because it was contaminated and based on "pseudo-science," and that Defendant Fox's statements should not be believed because they recited hearsay and also because he had been proven to be a liar.  The Court has rejected those arguments, as discussed above.

probable cause for arrest was destroyed once the fabricated evidence was removed from the affidavit.  In order to do that, Plaintiff relied solely on argument of counsel broadly attacking the forensic evidence relied on by Defendants, and claiming Fox's credibility should be considered completely destroyed.  As the Court has discussed above, these arguments fail; instead, it was incumbent on Plaintiff to specifically raise a genuine issue of fact concerning which pieces of evidence had been fabricated, and how the probable-cause analysis would be affected by removing those pieces from the picture.  For the reasons discussed above, the Court finds Plaintiff has failed to raise such a genuine issue of fact in this case.  Summary judgment will therefore be granted to all Defendants.

Dated this 20th day of December, 2010.

BRUCE D. BLACK
UNITED STATES DISTRICT JUDGE